UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )
                                    )
        v.                          )     No. 4:02CR20 CEJ
                                    )                 (FRB)
CHRISTOPHER CARPENTER,              )
                                    )
                Defendant.          )

**MEMORANDUM,**
**REPORT AND RECOMMENDATION**
<u>**OF UNITED STATES MAGISTRATE JUDGE**</u>

All pretrial motions in the above cause were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). The defendant filed a Motion to Suppress Evidence and Statements (Docket No. 21) to which the government responded. A hearing was thereafter held at which testimony and evidence was adduced. The parties filed post-hearing memoranda and supplemental post-hearing memoranda.

<u>Defendant's Motion to Suppress Evidence and Statements</u>

From the testimony and evidence adduced, the undersigned makes the following findings of fact and conclusions of law:

<u>Findings of Fact</u>

On December 18, 2001, Deputy David Rightnowar, of the Phelps County, Missouri, Sheriff's Department was on duty working in the vicinity of the Sugar Tree Road exit of Interstate Highway 44 in Phelps County, Missouri. He was driving a marked police car

and was in uniform. As a part of his duties that day Deputy Rightnowar placed two signs along Interstate 44 which read "Drug Enforcement Checkpoint Ahead 1/4 Mile." These signs were placed on each side of the eastbound lanes of the highway approximately 200-300 yards before the Sugar Tree Road exit ramp. A short distance further east of these two signs, and before the Sugar Tree Road exit ramp, were placed two additional signs in the same manner which read "Drug Dogs In Use." These signs were apparently placed as a ruse in the hope and belief by the Sheriff's Department that persons driving east on Interstate 44 who had drugs in their possession would get off of the highway at the Sugar Tree Road exit in an effort to avoid being stopped and found in possession of drugs at the imagined upcoming drug checkpoint. A drug interdiction program, in one form or another, had been operated by the Phelps County Sheriff's Department at this same location using this ruse for some period of time. Deputy Rightnowar cited statistics from a study conducted in 1997 that showed that 61% of "nonlocals" that exited at Sugar Tree Road after passing the drug checkpoint signs were found to be in possession of drugs. After placing the signs Deputy Rightnowar parked his police vehicle on a dirt road in a location 75-100 yards away from the exit and from which he was able to observe vehicles exiting eastbound Highway 44 at Sugar Tree Road. Phelps County Sheriff Blankenship was also working at the Sugar Tree Road exit as part of the drug interdiction. He parked his police vehicle in a parking area

-2-

nearby on the opposite (north) side of the highway. Sheriff Blankenship had a trained drug detection dog in his vehicle. Deputy Rightnowar described the method of operation of the program thusly: "We were watching for any nonlocal traffic that would exit the interstate and we tried to get reason to stop them, if they would run a stop sign or whatever we'd follow them for a ways and if they were nonlocals, why, we would try to find out what they were doing up there." Deputy Rightnowar defined "nonlocals" to be cars he didn't recognize or cars bearing out-of-state license places.

On that date, at about 4:00 p.m., Christopher Carpenter, the defendant here, was driving eastbound on Interstate 44. Carpenter was traveling from Texas to New York. He was driving a white colored Chevrolet Blazer, which he had rented in El Paso, Texas. There was contraband in the car. Carpenter exited at the Sugar Tree Road exit after seeing the signs set out by Deputy Rightnowar because he wanted to avoid the checkpoint. Carpenter stopped at the stop sign at the top of the exit ramp. He then turned right and drove south on County Road 7300. Because his car was low on gas Carpenter decided to look for a service station.

In the meanwhile, Deputy Rightnowar had noticed Carpenter exit the highway and turn on to County Road 7300. Even though he had not seen Carpenter commit any traffic violation Deputy Rightnowar decided to follow Carpenter because he didn't recognize the car which "just didn't look normal for the area." Deputy

-3-

Rightnowar then drove south on County Road 7300 following Carpenter's vehicle.

As Carpenter drove on the county road he soon realized there were no service stations in the area. In his rear view mirror he saw that there was a police car following him. At that point Carpenter was concerned that he had driven into a trap. He decided to make a U-turn and pulled onto the side of the road. As Deputy Rightnowar rounded a curve he saw Carpenter's car parked on the side of the road. He then pulled his police car off of the road and behind Carpenter's car. As he did so he activated the emergency flashing lights atop his police car.

Deputy Rightnowar pulled his police vehicle in behind Carpenter's stopped vehicle because "I noticed it was a Texas plate and he had come off the interstate. I just felt he'd probably be in possession of drugs."

Deputy Rightnowar then got out of his police car and walked to the driver's side door of Carpenter's vehicle. As he approached he motioned in a downward fashion with his hand. Carpenter saw this motion and interpreted it as a signal that the officer wanted him to turn off the engine of his car, which was still running. Carpenter did so.

Deputy Rightnowar asked Carpenter if he was lost. Carpenter said no, and told the deputy that he had exited the interstate highway looking for a gas station but realized there were none in the area and intended to turn around and to get back

onto the interstate. Deputy Rightnowar thought this suspicious as there are no such services at the Sugar Tree Exit, but there are such services located at other close locations both before and after the Sugar Tree exit. However, Deputy Rightnowar did not further question Carpenter about this suspicious statement.

Deputy Rightnowar then asked Carpenter where he was destined and from where he had come. Carpenter replied that he was traveling from Austin, Texas, to New York state. Deputy Rightnowar then asked to see Carpenter's driver's license and registration. Carpenter gave his Texas driver's license to the deputy. He also handed to the deputy documents showing that the vehicle he was driving was a rental vehicle. At some point while he stood beside the vehicle conversing with Carpenter Deputy, Rightnowar put his head through the driver's side window and looked at the gasoline gauge on the dashboard and saw that it registered a level of 1/4 tank. Carpenter appeared to Deputy Rightnowar to be nervous as the deputy could see an artery in his neck pulsing.

Deputy Rightnowar then took the driver's license and rental papers and went to his patrol vehicle where he remained for 4 or 5 minutes. In examining the rental documents Deputy Rightnowar noticed that the automobile had been rented in El Paso, although Carpenter had said he was traveling from Austin. Deputy Rightnowar did not look to see when the car had been rented. Deputy Rightnowar did not ask any questions of Carpenter as to this perceived discrepancy. The record is unclear whether Deputy

Rightnowar ever ran a check of Carpenter's license or the registration of the vehicle.

After a few minutes Deputy Rightnowar returned to stand beside Carpenter's vehicle.  He asked Carpenter what was in the cargo area of the vehicle.  Carpenter replied that there were boxes of tile.  Deputy Rightnowar then asked Carpenter if he could look into the boxes.  Carpenter asked if there was some problem regarding his license.  He told Deputy Rightnowar that the boxes were all packaged up and he didn't understand why the deputy needed to look inside them.  Deputy Rightnowar then told Carpenter that he had exited the highway at a drug interdiction area, that he believed Carpenter had exited the interstate highway to avoid being stopped at a drug checkpoint, and that he believed Carpenter had drugs in the car.  Deputy Rightnowar then told Carpenter that there was a drug dog nearby and that if Carpenter would not consent to the search the Deputy could call for the drug dog.  Carpenter again told Deputy Rightnowar that he saw no reason for the deputy to search his car and refused to give him permission to do so.  Deputy Rightnowar then asked Carpenter to step out of his vehicle and he did so.  Deputy Rightnowar patted down the defendant's shirt and pants pockets to determine whether he was carrying any weapons. The two men then stood behind Carpenter's vehicle.

At about this time Sheriff Blankenship arrived on the scene.  He parked his police car behind Deputy Rightnowar's vehicle.  The sheriff got out of his car, along with his drug

detection dog, and walked up and spoke with Deputy Rightnowar.
Deputy Rightnowar told Sheriff Blankenship that Carpenter had
"rented the vehicle in El Paso and told me he was coming from
Austin, and I believed he had drugs, he's refusing a search" and
"asked [the sheriff] to run a canine around" the car. Sheriff
Blankenship then walked the drug detection dog around the outside
of the vehicle and the dog alerted positively to the odor of drugs
in the car. Deputy Rightnowar saw that the dog made a positive
alert. He then told Carpenter that the dog had alerted to the car
and that he was going to search the vehicle.

Deputy Rightnowar then searched the vehicle. He opened
the boxes in the rear cargo area of the vehicle and saw numerous
plastic wrapped bundles. Using a pocket knife he slit open one of
the bundles and found it to contain a white powder substance which
he believed to be cocaine.

Deputy Rightnowar then placed Carpenter under arrest. He
then advised Carpenter of certain constitutional rights, and
specifically, that he had the right to remain silent; that anything
he said could be used against him; that he had a right to a lawyer
and to have the lawyer present with him during questioning; that if
he could not afford a lawyer one would be appointed for him before
questioning if he wished; and that he could exercise those rights
and choose not to answer questions. After being so advised
Carpenter said that he understood these rights. Deputy Rightnowar
then asked Carpenter if he wanted to cooperate with authorities to

make a controlled delivery of the cocaine.  Carpenter told Deputy Rightnowar he would have to think about it.  Sometime later Carpenter told Rightnowar he feared that if he cooperated with police that his family would be in danger.

Carpenter was transported to the Phelps County Sheriff's Office.  Officials from the Drug Enforcement Agency were notified of the circumstances and Officer Jeff Hoots of that office was dispatched to investigate the matter.  Upon arriving at the sheriff's office, at about 6:30 p.m., Officer Hoots spoke briefly with Carpenter.  Before doing so he again advised Carpenter of the same rights of which he had earlier been advised by Deputy Rightnowar.  He did so by reading the rights from a printed form.  Carpenter said that he understood the rights and would speak with the officer, but declined to sign the portion of the written form stating that he had agreed to waive his rights.  Carpenter asked what would happen if he cooperated.  Officer Hoots outlined to Carpenter the information in which the officers were interested, and said that if Carpenter cooperated the United States Attorney would be notified of his cooperation.  The conversation ended after about five minutes.

A short while later Officer Hoots was told by a jailer that Carpenter wished to speak with the Officer. Officer Hoots then again spoke with Carpenter and Carpenter made statements to the officer about how he became involved in the matters which led to his arrest and other information about the destination of the drugs

-8-

he had been transporting.   Officer Hoots asked the defendant to
participate in a controlled delivery of the cocaine but Carpenter
again declined citing safety concerns.

The vehicle which Carpenter had been driving and the
cocaine inside of it were also seized and transported to the Phelps
County Sheriff's office.   A number of items were seized from
Carpenter's person at the time he was booked at the Phelps County
jail, including a wallet, driver's license, telephone pager and a
wristwatch.

The above findings are based on the evidence adduced at
the hearing that the undersigned finds credible.   Both Deputy
Rightnowar and defendant Carpenter testified at the hearing. Their
testimony agreed in some respects but differed on many significant
matters.   Deputy Rightnowar's recollection of the event seemed at
times vague even though the motion hearing was held approximately
two months after the stop in question.   He answered many pertinent
questions by saying he did not recall.   Some of his answers on
direct examination were prompted by leading questions.   He was
unclear as to the timing or sequence of many of his acts.   After
listening to Deputy Rightnowar's testimony and observing his
demeanor the undersigned was left with a very distinct impression
that Deputy Rightnowar's memory of the details of the event was not
reliable and trustworthy.   The defendant Carpenter's testimony was
straightforward and forthright.   He appeared to have a clear
recollection of the events.   His demeanor was such that he appeared

to be answering all questions put to him in an honest and truthful manner.  He did not appear to hedge his testimony or to "gild the lily" in any degree.  The above findings therefore tend to rely more on the testimony of the defendant in finding the details, timing and sequence of events during the occurrence.

## Discussion

The defendant asserts, as one of his grounds to suppress the evidence seized from him and subsequent statements made by him, that he was seized within the meaning of the Fourth Amendment when he exited Interstate Highway 44 at the Sugar Tree Road exit as a response to and on account of the drug checkpoint signs placed along the highway by law enforcement officials.  He contends that the use of the signs to entice motorists to leave the highway, even though a ruse, amounted to an unlawful drug checkpoint of the type condemned as an unconstitutional violation of the Fourth Amendment by the Supreme Court in City of Indianapolis v. Edmonds, 531 U.S. 32 (2000), and by the Eight Circuit Court of Appeals in United States v. Yousif, 308 F.3d 820 (8th Cir. 2002).  However, the evidence adduced at the hearing showed that the manner in which the officers carried out their operation in this case differed from the procedures employed in both Edmonds and Yousif.

In Edmonds police placed signs along the road similar to those employed here.  They then stopped a predetermined number of vehicles.  The officers would ask the stopped drivers to produce a license and registration.  The officers would visually inspect the

-10-

vehicle from the outside and a drug detection dog would sniff the outside of the vehicle.  Officers would attempt to obtain consent to search the vehicle or to determine if a search was justified by suspicions developed during the stop.  Edmonds at 35-36.  The court noted that,

> The primary purpose of the Indianapolis narcotics checkpoints is in the end to advance "the general interest in crime control," Prouse, 440 U.S., at 659, n. 18, 99 S.Ct. 1391.  We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes.  We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime.

Edmonds at 44.

The court held that the random stop of vehicles, without individualized suspicion, for the general purpose of detecting criminal conduct violated the Fourth Amendment.

In Yousif the court addressed the "ruse checkpoint" operated by the Phelps County Sheriff's Office and Missouri Highway Patrol at the same Sugar Tree Road Exit involved in the instant case.  As in this case, signs were placed along the highway indicating a drug checkpoint with dogs in use was upcoming some distance ahead.  Officers were stationed at the top of the Sugar Tree Exit ramp.  Each vehicle that exited at the location was stopped.  The driver was asked to produce a license, registration and proof of insurance.  If the officers believed the vehicle

contained contraband they would ask for consent to search. If consent was refused but the officer had reasonable suspicion to believe that contraband was involved a drug dog was allowed to sniff the outside of the vehicle. If the dog did not alert and there were no other grounds to further detain the vehicle and/or its occupant(s), they were allowed to leave. <u>Yousif</u> at 823-24. The court held that, in the circumstances the initial stop and detention of the defendant's vehicle, was not supported by any individualized reasonable suspicion of criminal activity, and that the stop was an unlawful seizure in violation of the Fourth Amendment. <u>Yousif</u> at 829.

The evidence adduced in the instant case showed that the checkpoint was not operated in this instance in the same manner as in <u>Yousif</u>. Here, the officers did not stop every vehicle which exited. Rather, they observed the vehicles to determine whether any traffic violations were committed or whether there were other circumstances which would permit them to stop the vehicle. The Eighth Circuit Court of Appeals has held that the "ruse checkpoint" at the Sugar Tree Exit when operated and carried out in the manner described here does not run afoul of the holdings in <u>Edmonds</u> and <u>Yousif</u>. <u>United States v. Martinez</u>, 358 F.3d 1005 (8th Cir. 2004).

Therefore, the defendant's claim that he was seized within the meaning of the Fourth Amendment when he exited the highway is without merit.

The defendant contends that he was stopped, or seized within the meaning of the Fourth Amendment, when Deputy Rightnowar pulled the police car behind defendant's vehicle and turned on his emergency flashing lights. Defendant contends that this stop was unlawful because the officer had not observed the defendant commit any traffic violation or other violation of law, and did not have sufficient information to reasonably suspect that the defendant was engaged in criminal activity. The government argues that the initial contact between the officer and the defendant began as a consensual encounter and that "not until Deputy Rightnowar asked defendant Carpenter to accompany him back to the patrol car did the contact rise to the level of a detention." (Government's Post-Hearing Memorandum of Law, Doc. No. 35, at P.8).

The Fourth Amendment of the United States Constitution sets out the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Constitution, Amend. IV. The Eighth Circuit Court of Appeals has described that,

> Supreme Court jurisprudence has placed police-citizen encounters into three tiers or categories: First, there are communications between officers and citizens that are consensual and involve no coercion or restraint of liberty. Such encounters are outside the scope of the Fourth Amendment. Second, there are the so-called *Terry*-type stops. These are brief, minimally intrusive seizures but which are considered significant enough to invoke Fourth Amendment safeguards and thus must be supported by a reasonable suspicion of criminal

activity.  Third, there are highly intrusive, full-scale arrests, which must be based on probable cause.

United States v. Poitier, 818 F.2d 679, 682 (8th Cir. 1987) cert. denied, 484 U.S. 1006 (1988).  The court noted that in analyzing police/citizen encounters a court must ". . . determine whether [defendant] was seized and if so, at what point; and if [defendant] was seized, was there objective justification sufficient to create reasonable suspicion that [defendant] was engaging in criminal activity."  Id. at 681.

As the above discussion recognizes not every encounter between a police officer and a citizen constitutes an unreasonable seizure under the Fourth Amendment:  "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons.  Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."  Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968); see also United States v. Mendenhall, 446 U.S. 544, 553-54 (1980)("Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards.  The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'")(quoting United States v. Martinez-Fuerte, 428 U.S.

543, 554 (1976)). "[M]ere police questioning does not constitute a seizure." <u>Florida v. Bostick</u>, 501 U.S. 429, 434 (1991). "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." <u>Id.</u> (quoting <u>Florida v. Royer</u>, 460 U.S. 491, 497 (1983)(plurality opinion)).

In order to determine whether or when an encounter between a police officer and a citizen constitutes a Fourth Amendment detention or seizure, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" <u>Id.</u> at 437 (quoting <u>Michigan v. Chesternut</u>, 486 U.S. 567, 569 (1988)); <u>see also</u> <u>Mendenhall</u>, 446 U.S. at 554 (holding "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"). A police officer's subjective belief as to whether or not he has detained an individual plays no part in the Fourth Amendment analysis. The court must "examine the facts and circumstances at the time from [the defendant]'s perspective as a reasonable person being

questioned." <u>United States v. Garcia</u>, 197 F.3d 1223, 1226 (8th Cir. 1999).

Deputy Rightnowar's act of pulling his police vehicle behind defendant's car as it was stopped at the side of the road and turning on his flashing lights did not constitute a seizure within the meaning of the Fourth Amendment. <u>United States v. Dockter</u>, 58 F.3d 1284, 1287 (8th Cir. 1995). Nor was the defendant "seized" when Deputy Rightnowar approached the defendant's car, and asked the defendant if he was lost. <u>United States v. Jefferson</u>, 906 F.2d 346, 349-50 (8th Cir. 1990); <u>United States v. Barry</u>, 394 F.3d 1070, 1075 (8th Cir. 2005).

When told by the defendant that he was looking for a gas station, Deputy Rightnowar began asking additional questions. He asked details of the defendant's travel and asked to see the defendant's driver's license and vehicle registration. At some point he leaned inside of the driver's window to look at the gasoline gauge on the car. He took the defendant's driver's license and car rental agreement and went to his patrol vehicle where he remained for 4 or 5 minutes. He then returned to the defendant's vehicle and asked what was in the boxes in the cargo area of the vehicle. The defendant replied that the boxes contained tile. Deputy Rightnowar then asked if he could look in the boxes and the defendant told Deputy Rightnowar that he didn't see any reason why the deputy needed to look in the boxes. Deputy Rightnowar then told the defendant that he suspected that he was

-16-

carrying drugs in the car and that if the defendant refused to permit a search the deputy could call for a drug dog located nearby.  The defendant continued to deny permission to search and Deputy Rightnowar then told him to step out of the car.  The deputy continued to have possession of the defendant's driver's license and car rental agreement.   The defendant was "seized" or detained within the meaning of the Fourth Amendment when Deputy Rightnowar took the defendant's driver's license and rental documents and went back to his patrol car.  No reasonable person would have felt free to drive off leaving their driver's license and vehicle papers behind.  Further, any reasonable person would expect that if he did so he would be pursued and stopped by the officer.  If the seizure of the defendant had not occurred by that point it most assuredly had by the time Deputy Rightnowar told the defendant that he suspected that he possessed drugs and asked him to get out of his vehicle.  At such point, if not sooner, a reasonable person would have believed that they were not free to leave, and a Fourth Amendment seizure had occurred.  See Florida v. Royer, 460 U.S. 501 ("[w]hen the officer identified themselves as narcotics agents, told [defendant] that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, [defendant] was effectively seized for the purposes of the Fourth Amendment."); United States v. Jefferson, 906 F.2d at 350 (Driver of parked vehicle seized when

ordered out of vehicle while officer possessed driver's license and car rental agreement); United States v. Barry, 394 F.3d 1070, 1075 (8th Cir. 2005)(Driver of parked vehicle seized when asked by officer to exit vehicle); United States v. Beck, 140 F.3d 1129, 1135-36(8th Cir. 1998)(Consensual encounter became Fourth Amendment seizure when driver told that drug dog would be called to sniff car if driver refused to consent to search of vehicle); United States v. Morgan, 270 F.3d 625, 630 (8th Cir. 2001), cert. denied, 537 U.S. 849 (2002)(Same).

Inasmuch as the defendant was seized within the meaning of the Fourth Amendment when he was asked to step out of his vehicle it must be determined whether, under the totality of the circumstances, the facts known to Deputy Rightnowar at that time amounted to an objectively reasonable articulable suspicion that the defendant was engaged in criminal activity. Terry v. Ohio, 392 U.S. 1, 21 (1968). The standards to be used in assessing whether such reasonable suspicion existed were set out by the Eight Circuit Court of Appeals in United States v. Campbell, 843 F.2d 1089 (8th Cir. 1988).

> The standard of articulable justification required by the fourth amendment for an investigative, *Terry*-type seizure is whether the police officer were aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed. In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively

establish reasonable suspicion, not whether each
particular fact establishes reasonable suspicion.
[T]he totality of the circumstances-the whole
picture-must be taken into account.  We may
consider any added meaning certain conduct might
suggest to experienced officers trained in the arts
of observation and crime detection and acquainted
with operating modes of criminals.  It is not
necessary that the behavior on which reasonable
suspicion is grounded be susceptible only to an
interpretation of guilt, however, the officers must
be acting on facts directly relating to the suspect
or the suspects's conduct and not just on a "hunch"
or on circumstances which describe a very broad
category of predominantly innocent travelers.

Id. at 1093 (Internal citations omitted).

The fact that the defendant exited the highway at the

exit where the checkpoint signs were located can play no part in

any reasonable equation.

[T]here is nothing inherently unlawful or
suspicious about a vehicle (even one with out-of-
state license plates) exiting the highway [and] it
should not be the case that the placement of signs
by the police in front of the exit ramp transforms
that facially innocent behavior into grounds for
suspecting criminal activity.  Reasonable suspicion
cannot be manufactured by the police themselves.

United States v. Yousif, 308 F.3d 820, 829 (8th Cir. 2002).  As the

court in Yousif noted, there are wholly innocent reasons for

exiting the highway at such a point, Id. at 827-28.

The government argues that, excluding consideration of

the defendant's exit from the highway at Sugar Tree Road exit, the

other information known to Deputy Rightnowar before he asked the

defendant to step out of the car was sufficient to generate such

-19-

reasonable suspicion.  In its Post Hearing Memorandum of Law and Supplemental Memorandum of Law the government identifies the information as follows:  (1) the defendant was traveling on Interstate 44, a known route for cross-country transportation of illegal drugs, (2) that the defendant's vehicle bore out of state license plates from Texas, a drug source state, (3) that the defendant stopped for no apparent reason on the side of the road in a rural area, (4) that the vehicle was a rental vehicle, (5) the defendant's statements that he was looking for a gas station (characterized by the government as a lie), (6) the defendant's statements that he was traveling from Austin, Texas (characterized by the government as a lie) when the rental agreement showed that the car was rented in El Paso, Texas, (7) the defendant "responded strangely" when asked about the boxes in the cargo area of the vehicle, and lastly (8) the defendant appeared nervous.

Several of these same factors were cited by the government as bearing on reasonable suspicion and found wanting in <u>United States v. Beck</u>, 140 F.3d 1129 (8th Cir. 1998). Specifically, the government claimed that the fact that the defendant was traveling on an interstate highway in a rented vehicle bearing out of state license plates from a source state were significant factors in creating reasonable suspicion that the defendant possessed drugs.  The court held that "there was nothing inherently suspicious in [defendant's] use of a rental vehicle . . . to travel." <u>Id.</u> at 1137.  It was also noted that the court had

"previously held that out-of-state plates are consistent with innocent behavior and not probative of reasonable suspicion." Id. The government also contends that suspicions were raised because the defendant was traveling from Texas, a known source of narcotics. There is nothing in the record indicting that Deputy Rightnowar knew or considered Texas to be a source of narcotics. Rather, he merely stated that he was suspicious of all out-of-state, or non-local, vehicles that exited at Sugar Tree Road, a notion specifically rejected by the court in Yousif, as already discussed, supra. Even if Deputy Rightnowar were to have had such knowledge, that factor would have little probative value as is thoroughly discussed in Beck. The fact that millions of law abiding citizens may reside in a state "must relegate this factor to a relatively insignificant role." Id. at 1137. Nervousness of a defendant during an encounter with police as a factor in arousing suspicion has been minimized by the court on numerous occasions. "[B]ecoming nervous when one is confronted by officers of the law is not an uncommon reaction." United States v. White, 890 F.2d 1413, 1418 (8th Cir. 1989), cert denied, 498 U.S. 825 (1990). See also, United States v. Wood, 106 F.3d 942, 948 (10th Cir. 1997) and cases cited therein; Beck, supra.

When Deputy Rightnowar caught up to the defendant's vehicle it had pulled off of the road. The area where the defendant stopped is a largely rural area. Officer Rightnowar decided to stop to inquire of the defendant why he had stopped in

the area.    After approaching the defendant's vehicle Deputy
Rightnowar asked the defendant if he was lost.    The defendant
replied no and told the Deputy that he had gotten off of the
highway looking for a gas station but had realized there wasn't one
in the area and had stopped and pulled off of the road so that he
could turn the vehicle around and go back to the highway. Deputy
Rightnowar disbelieved this explanation because he was aware that
there were gasoline service stations at other nearby exits both
before and after the Sugar Tree Road exit.    However, Deputy
Rightnowar did not further ask the defendant why he had not stopped
earlier at such an exit or continued on to such an exit, or further
question the defendant about this apparent implausible explanation.
Rather, he asked the defendant from where he had come.    The
defendant replied that he was traveling from Austin, Texas.  Deputy
Rightnowar then asked to see the defendant's driver's license and
registration and the defendant produced a driver's license and
vehicle rental form and gave them to Deputy Rightnowar who took
those items and went to his patrol car.

        Deputy Rightnowar examined the documents and noted that
although the defendant said he was traveling from Austin, Texas,
the rental document showed that the vehicle was rented in El Paso,
Texas.  The government relies on this apparent inconsistency as a
ground for Deputy Rightnowar's further suspicion that the defendant
was engaged in criminal activity.  However, once again, as with his
suspicion of the defendant's explanation of his reason for exiting

and stopping on the road, Deputy Rightnowar did not further question the defendant about this apparent discrepancy or ask for an explanation of it. A similar situation was addressed by the court in United States v. Wood, 106 F.3d 942 (10th Cir. 1997). In that case a police officer stopped a vehicle on an Interstate Highway for speeding. During the stop the officer learned that the stopped car was a rental vehicle. The driver told the officer that the car had been rented in San Francisco. However, when the officer examined the rental documents produced by the driver the papers showed that the car had been rented in Sacramento. During the course of the encounter the officer asked the driver for consent to search the car. The driver refused and the officer then told the driver that he was going to detain the car and to subject it to a drug dog sniff. The government maintained that the officer had reasonable articulable suspicion to detain the car citing, among other factors, the discrepancy between the driver's statement as to where the vehicle had been rented and the location shown on the rental papers. The court noted that ". . . [I]nconsistencies in information provided to the officer during the traffic stop may give rise to reasonable suspicion of criminal activity . . . . However, [defendant's] error in identifying the city where he rented the car is not the sort of inconsistency that warrants such a conclusion." Id. at 947. The court noted that if there were evidence that the defendant was attempting to conceal the fact that he had rented the car in a city known to be a drug source then the

discrepancy might have some significance. The court noted that there was no such evidence in the record. It also noted that, although the officer testified that California was known as a source state for narcotics, ". . . the trooper did not indicate, nor is there any evidence in the record, that Sacramento is regarded as a source city of narcotics, while San Francisco is not." Id. The same is true here. Deputy Rightnowar offered no explanation as to why this discrepancy led him to suspect that there were drugs in the vehicle. As did the court in Wood, the Eighth Circuit Court of Appeals has acknowledged that "Law enforcement officers are permitted to draw 'inferences and deductions that might well elude an untrained person'." United States v. Johnson, 171 F.3d 601, 604 (8th Cir. 1999)(Internal citations omitted. "Nevertheless, those inferences and deductions must be explained." Id. (emphasis in original) Deputy Rightnowar offered no explanation or reason as to why the discrepancy caused him to suspect criminal activity and therefore it has no value in the determination of whether he had a reasonable suspicion to detain the vehicle further.

The government also asserts that the defendant made a strange reply when asked by Deputy Rightnowar what was in the boxes in the rear of the car. The credible evidence shows that when asked, the defendant replied that the boxes contained tile. Why the government considers this response to be strange is unclear and not further elaborated.

As the court appropriately noted in <u>Beck</u>,

> While we are mindful that conduct which would be
> wholly innocent to the untrained observer . . .
> might acquire significance when viewed by an agent
> who is familiar with the practices of drug
> smugglers and the methods used to avoid detection,
> it is impossible for a combination of wholly
> innocent factors to combine into a suspicious
> conglomeration unless there are concrete reasons
> for such an interpretation.
>
> . . .
>
> We conclude that the constitutionality of Beck's
> renewed detention and resulting search cannot be
> saved by the government's incantation that: "A
> series of acts that appear innocent, when viewed
> separately, may warrant further investigation when
> viewed together."

<u>Beck</u>, <u>supra</u>, at 1137, 1139.

Lastly, the defendant's refusal to consent to a search of the vehicle cannot be considered in any reasonable suspicion analysis. <u>United States v. Green</u>, 52 F.3d 194, 200 (8th Cir. 1995)("[W]e do not endorse the view that refusing to consent to the search of one's bag is indicative of criminal behavior . . ."); <u>United States v. Wood</u>, 106 F.3d 942, 946 (10th Cir. 1997)("[I]t should go without saying that consideration of such a refusal would violate the Fourth Amendment").

The factors cited by the government here when viewed in their totality, and in the particular circumstances of this case, simply do not give rise to a reasonable suspicion to detain the defendant and his vehicle for purposes of a dog sniff and further

-25-

search of the car.

In its original pre-hearing Response to the defendant's original Motion to Suppress Evidence and Statements the government asserted that the defendant consented to the search of his vehicle. The statement was apparently premised on the anticipated testimony of Deputy Rightnowar, subsequently given at the hearing, that after the drug dog alerted to the car Deputy Rightnowar told the defendant that the drug dog had alerted to the vehicle and "told Mr. Carpenter that we needed to search his vehicle. He said go ahead." It is unclear whether the government has abandoned this claim. It was not briefed or argued in any of the post hearing memoranda filed by the government. The argument is addressed here in the event that the government would continue in its assertion of consent as a ground for the search. The defendant in his testimony denied that he had ever consented to the search or had made such a statement. The undersigned specifically finds the defendant's testimony to be more credible. Both the Deputy and the defendant testified that the defendant had earlier refused to consent to the search and the defendant's testimony that he did not abandon this position, even after the dog alert, was credible. Even if Deputy Rightnowar's testimony on this point was found credible, the statement "Go ahead" after the assertion made by the Deputy could not, in the circumstances, be construed to be a voluntary consent to search. See Bumper v. North Carolina, 391 U.S. 543 (1968); United States v. Morgan, 270 F.3d 625, 631 (8th Cir. 2001), cert.

denied 537 U.S. 849 (2002)(No voluntary consent to search when driver, who had earlier refused consent said "go ahead" when officer advised he intended to walk drug dog around vehicle).

The government contends that because the detention of the defendant was brief, the intrusion on the defendant's personal liberty was de minimis and therefore not a Fourth Amendment violation, citing United States v. $404,905.00 In U.S. Currency, 182 F.3d 643 (8th Cir. 1999), cert. denied, 528 U.S. 1161 (2000), and United States v. Morgan, 270 F.3d 625 (8th Cir. 2001), cert. denied, 537 U.S. 849 (2002). The holding in those cases is not applicable in the facts and circumstances here. Both of those cases involved drivers who had been lawfully stopped for traffic violations. In both cases the officer who made the traffic stop had a drug detection dog present with him in the police vehicle. After the traffic stops were completed, the officer in each case allowed the drug dog to sniff the stopped vehicle. In each instance the court found that even though the traffic stop, and thus the reason for the defendant's detention, had ended, the brief time that it then took to let the dog sniff the car was a de minimis intrusion on the defendant's liberty interest and therefore not a Fourth Amendment violation. In the case at hand Deputy Rightnowar had already detained the defendant without cause for a substantial period of time before the drug dog arrived. This was not a brief extension of an otherwise lawful traffic stop. Further, application of this de minimis doctrine as urged by the

-27-

government would have been equally applicable in the <u>Yousif</u> case.
The detention of the drivers in that case was just as brief as that
of the defendant here.  And as in <u>Yousif</u> the detention of the
defendant here without adequate reasonable suspicion causes the
subsequent search to be unlawful.

The government recently drew the court's attention to the
Supreme Court's decision in <u>Illinois v. Caballes</u>, ___ U.S. ___, 125
S.Ct. 834 (2005).  In that case the Supreme Court held that "a dog
sniff conducted during a concededly lawful traffic stop that
reveals no information other than the location of a substance that
no individual has any right to possess does not violate the Fourth
Amendment." <u>Id.</u> at 838.  That holding is inapplicable here because
it presupposes that the dog sniff occurred during a lawful traffic
stop.  The Supreme Court took pains to note the narrow issue which
it was addressing in the opinion, saying, "The question on which we
granted certiorari is narrow:  Whether the Fourth Amendment
requires reasonable articulable suspicion to justify using a drug-
detection dog to sniff a vehicle during a legitimate traffic stop."
<u>Id.</u> at 837.  There was no traffic stop here, lawful or otherwise,
and therefore the <u>Cabellas</u> opinion does not apply in these
circumstances.

Therefore, the evidence seized from the defendant's
vehicle should be suppressed and not admitted in evidence at trial.

After discovering cocaine in the defendant's vehicle
Deputy Rightnowar placed him under arrest and advised him of his

constitutional rights as required by <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and the defendant acknowledged that he understood those rights. Deputy Rightnowar then asked the defendant if he would participate in a controlled delivery of the drugs. The defendant said he would have to think about it and expressed fear for his family if he did so.

Following the arrest the defendant was transported to the Phelps County Sheriff's Office. Agents of the Drug Enforcement Administration (DEA) were contacted and arrived at the Sheriff's Office between 6:30 and 7:00 p.m. DEA Agent Hoots then readvised the defendant of his <u>Miranda</u> rights and then spoke with the defendant. Once again, the focus of the discussion was whether the defendant would cooperate by making a controlled delivery. The defendant appeared reluctant to do so and the interview was terminated. A few minutes later Agent Hoots was notified that the defendant wished to speak with him. Agent Hoots then again spoke with the defendant and the defendant made incriminating statements. Agent Hoots renewed his effort to have the defendant participate in a controlled delivery but the defendant continued to express concern for his safety if he did so, and declined.

The arrest of the defendant and subsequent statements made by him were the direct result of the unlawful detention and search by Deputy Rightnowar. They are therefore the tainted fruits of such unlawful activity and should not be admitted in evidence against the defendant at trial. <u>Wong Sun v. United States</u>, 371

U.S. 471, 485 (1963). The statements were made in close proximity to the arrest. The focus of the officers' questioning starting with Deputy Rightnowar and continuing with Agent Hoots was to seek the defendant's assistance in furthering the investigation of evidence obtained in the unlawful search. Even though the defendant was advised of his <u>Miranda</u> rights by each of the officers, this fact did not serve to attenuate the taint of the original unlawful detention and search <u>Brown v. Illinois</u>, 422 U.S. 590, 603 (1975); <u>United States v. Reinholz</u>, 245 F.3d 765, 779-80 (8th Cir.), <u>cert.</u> <u>denied</u>, 534 U.S. 896 (2001).

Therefore, the statements made by the defendant to Agent Hoots should be suppressed and not admitted in evidence in chief at the trial of the case.

<u>Conclusion</u>

For all of the foregoing reasons the defendant's Motion to Suppress Evidence and Statements should be granted.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant's Motion to Suppress Evidence and Statements (Docket No. 21) be granted.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in

waiver of the right to appeal questions of fact.  <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).


_Frederick R. Buckles_

UNITED STATES MAGISTRATE JUDGE


Dated this 1st day of April, 2005.